### APPEAL OF UNION COLLIERIES CO.

Docket No. 1612.   Submitted August 31, 1925.   Decided February 3, 1926.

The cost of coal-mining machinery and equipment *held* not deductible as ordinary and necessary expenses.
An alleged bad debt *held* not deductible.

*William A. Seifert* and *Hale Hill, Esqs.*, for the taxpayer.
*Willis D. Nance, Esq.*, for the Commissioner.

Before STERNHAGEN and LANSDON.

This is an appeal from the determination of a deficiency of $91,-346.12 in income and profits taxes for 1918. The taxpayer claims the right to a deduction of amounts paid for rails, cars, motors, machinery, switches, and frogs, as ordinary and necessary expenses, and also of an amount alleged to be a bad debt deductible within the year.

#### FINDINGS OF FACT.

The taxpayer is a Pennsylvania corporation, organized in March, 1915, to mine and sell coal. Throughout 1918 it owned and operated three mines, all of which are located in Pennsylvania, and are designated as Mine No. 1, Mine No. 2, and Mine No. 3. Mines Nos. 1 and 2 are drift mines in the Pittsburgh seam. Their development was begun in the latter part of 1915. In 1918 there was installed in Mine No. 1, one mining machine, which cost $2,785.47, and in Mine No. 2, one mining machine, which cost $2,785.48. In both mines there were 17 pit cars, which cost $3,183.33. There were also used, in 1918, in Mine No. 1, ties, rails, spikes, switches, and frogs, which cost $7,343.78; and in Mine No. 2, $9,808.46. These amounts were all charged to operating cost in 1918.

The net tons produced were as follows:

|  | Mine No. 1 | Mine No. 2 |  | Mine No. 1 | Mine No. 2 |
|---|---|---|---|---|---|
| 1917 | 142,884.43 | 108,552.60 | 1921 | 39,884.74 | 15,234.20 |
| 1918 | 198,113.90 | 181,024.60 | 1922 | 19,109.48 | 17,712.70 |
| 1919 | 119,335.21 | 66,025.40 | 1923 | Exhausted. | Exhausted. |
| 1920 | 112,993.32 | 51,649.93 |  |  |  |

The number of men employed in the two mines were as follows:

|  | Mine No. 1 | Mine No. 2 |  | Mine No. 1 | Mine No. 2 |
|---|---|---|---|---|---|
| 1917 | 124 | 100 | 1920 | 65 | 35 |
| 1918 | 121 | 107 | 1921 | 45 | 31 |
| 1919 | 123 | 105 | 1922 | 58 | 52 |

The reason for the purchase and use of additional equipment in the mines after January 1, 1918, was that, as the mine work proceeded further from the opening or tipple, more track and equipment was necessary to bring out the coal and maintain production.

Accidents are so frequent in mining, such as the covers falling in, that it is not possible to determine accurately the life of light rails, ties and similar equipment. Heavy rails which are used on the main line of haulage will last longer than light rails. Cars are frequently repaired, and are used more than a year, except when lost or destroyed in an accident. Mining machines will, with ordinary repairs, last more than a year. Those purchased in 1918 for use in Mines Nos. 1 and 2 were used until the mines were exhausted, and were then rebuilt. Switches have a life of more than one year, when subjected to ordinary wear and tear.

The taxpayer filed a claim for an amortization deduction for the taxable year, which included the amortization of some of the same properties which are now sought to be included in the deduction for ordinary and necessary expenses. The Commissioner allowed a deduction for amortization, but not upon all the properties or in the full amount claimed.

On April 2, 1917, the taxpayer executed a written agreement with Benjamin Nicoll, giving him the exclusive agency for the sale of its coal (with exceptions not here material), the expenses of sale to be borne by the agent, the compensation being 3 per cent of the selling price f. o. b. mines. Other portions of the agreement are as follows:

Sixth. All sales are to be made for the account of the Company, in such amounts, for such deliveries and at such prices as shall be from time to time approved by it, and shall be invoiced to the purchaser in the name of Union Collieries Company, B. Nicoll & Co., Agent, and payment for the same shall be made to the said agent by the purchasers thereof, and this condition as to payment shall be stated on the contracts of sale. The invoices shall indicate that the Agent is Sales Agent for the Company, and the Corporate name of the Company shall appear thereon.

Seventh. The Agent hereby guarantees to the Company all accounts for coal sold by the Agent under the terms of this agreement, and the Agent agrees to make payment to the Company on the 25th day of each month for all coal delivered to the purchasers thereof during the preceding month, less the commissions to which the Agent shall be entitled on or in respect to the coal so delivered. While the Agent guarantees to the Company all accounts for coal delivered under this agreement, it is expressly agreed that the Agent shall not be held responsible for any claims made by customers on account of the quality of the coal shipped, shortage in shipments, or any other claims arising or alleged to have arisen on account of any act or omission of the Company, nor shall the Agent be required to pay for coal in any case where the obligation of the purchaser to pay for the same shall be in dispute on the ground that the Company has failed to carry out the covenants and conditions in the sales contract or contracts approved by it. And in the event that the Agent shall have made payment for coal before such dispute shall have arisen, the Agent may withhold payment of the amount in dispute

from moneys of the Company thereafter coming into the Agent's possession, until such dispute shall have been adjusted. The Agent shall in no event be liable for payments for coal sold to purchasers in case the Coal Company shall release the liability of the purchasers to pay for coal by reason of breach of the sales contract or contracts, or otherwise. Said payments shall be based upon the weights of coal furnished by the Company to the Agent from the railroad weights at the scales nearest to the loading point of said coal. The moneys payable by the Agent under this paragraph are in so [sic] sense advances, but are payments for coal delivered by the Company.

Eighth. If at any time during the existence of this agreement, the Agent is unable to sell all the coal produced by the Company from its mines at prices not less than those last theretofore fixed by the Company, the Company shall have the right to sell so much of said coal as the Agent is unable to sell, and, for such coal so sold by the Company, the Agent shall not be entitled to commissions, nor shall the Agent be obliged to guarantee the accounts for coal so sold by the Company. The inability of the Agent to sell the coal produced by the Company at any given time or from time to time shall not affect the right of the Agent to sell said coal thereafter during the life of this agreement (in accordance with the provisions thereof.) It is understood and agreed, however, that the price or prices for which the Company's coal shall be sold by the Agent shall be fixed by the Company from time to time and the Agent shall be advised at his Pittsburgh Office by such authority in such manner as may be arranged by the Company, and the Company shall not at any time offer for sale, or sell any coal (as to which the Agent is herein constituted the Sales Agent of the Company) at a lower price or on other terms than that at which the Agent has been last theretofore authorized by the Company to sell the same.

In 1917 the taxpayer shipped coal covered by this contract, and at the end of 1917 there was an unpaid balance of the price of such coal amounting to $25,873.99. The taxpayer discussed this unpaid balance with Nicoll frequently in 1917 and 1918, but Nicoll denied liability and refused to pay at that time. At a meeting of the directors of the taxpayer on February 24, 1919, the following resolution was adopted:

Resolved, that whereas the Board of Directors have been advised that there is scarcely a possibility of the Company being able to collect its claim against B. Nicoll & Company, carried on the books of the company at $25,873.99,

Therefore, be it resolved that the said amount of $25,873.99 be charged to the profit and loss account of the company as a loss.

The amount of $25,873.99 was actually charged off the books of account after 1918, at the time in 1919 when the books were closed for 1918.

The following collections were subsequently made on this account:

| | |
|---|---:|
| Sept. 30, 1919 | $6,624.55 |
| Mar. 11, 1920 | 4,912.10 |
| Sept. 24, 1920 | 8,046.73 |
| Nov. 3, 1920 | 4,422.03 |
| | 24,005.41 |

The amounts recovered in 1919 and 1920 were included in the taxpayer's returns of taxable income for those years.

The coal which was covered by the $25,873.99 was required by the Government to be shipped and was shipped to a pool maintained at the Lower Lake ports. Coal from this pool could only be shipped upon the authorization and direction of the pool management. Some of the shippers had taken more coal from the pool than they were entitled to, and this left too little for the rest. Nicoll refused to pay the bill because, he said, he had not received his proper share of the coal in the pool. The taxpayer's counsel said the amount was uncollectible from Nicoll. The taxpayer continued to ship coal upon Nicoll's order under the contract during 1918. All coal was paid for, except the disputed coal in the pool. The payments were subsequently made for this coal because, through the efforts of the pool management, those who received more coal than they were entitled to paid for it.

### DECISION.

The determination of the Commissioner is approved.

### OPINION.

STERNHAGEN: The taxpayer, relying upon article 222, Regulations 45, urges that, in 1918, its Mines Nos. 1 and 2 had reached their normal production, and therefore the expenditures for cars, motors, machines, rails, ties, switches and frogs, when made, were properly deductible as ordinary and necessary business expenses. The argument is similar to that considered in the *Appeal of Bruin Coal Co.*, 1 B. T. A. 83, and *Appeal of Winifrede Coal Co.*, 1 B. T. A. 566, the former being relied upon by the taxpayer and the latter by the Commissioner. These decisions indicate the difficulty of regarding the article as an authoritative construction of the statute. Under it, the deductibility of any item, after a mine has reached "the development stage," depends first upon whether it is to be called a "major item" or a "minor item." This Board must apply the statute directly to the facts and may not insert into the statute a classification which is not there expressly or by clear implication. When the statute provides for the deduction of ordinary and necessary expenses, the Board will determine whether, all things considered, the expenses in question are such, and this determination should not be made to depend alone upon whether they are major or minor items. Such an inquiry would only inject into the problem an additional question no simpler than the primary question. The article also adds, as a factor of deductibility, that the item is "necessary to maintain the normal output." We think this is unauthorized and, to the extent that the opinion in *Appeal of Bruin Coal Co.*, 1 B. T. A. 83, adopts this criterion, it is overruled. In the *Winifrede*

*Appeal* the properties in question, including mining machines, which are also in issue here, had a useful life of several years, and the Board held them to be capital items and their cost not deductible as expenses.

In the present record, the taxpayer's engineering witness testified that all of the items in question would last more than a year, except for an accident, such as the collapse of the roof of the mine. It also appears that some of this property was used in Mines Nos. 1 and 2 until those mines were exhausted in 1922. The machines were thereafter rebuilt. Some of the cars were used in Mine No. 3. In such circumstances, it is our opinion that their cost should not be deducted so as to reduce taxable net income of the year of purchase, merely because they may serve to maintain production at its existing level. Like all other items of property used in the business of a taxpayer, they are subject to exhaustion, wear and tear, and obsolescence, and if, in a proper case, such exhaustion be measured by the units of production, this would be a normal method of recovering the initial outlay during the period of useful life. The loss by casualty is expressly provided for by a deduction when it occurs, just as the amortization deduction has already been provided for.

We are of opinion, also, that the deduction of the alleged bad debt was properly disallowed by the Commissioner. Whether there ever was a debt on this account owing by Nicoll is doubtful. From the contract it would seem that Nicoll's liability for the purchase price of coal was only a secondary liability, if any. We need not determine that question. Nicoll denied liability. But the coal had been shipped, and the Fuel Administration distributed it through the coal pool of the Lower Lake ports. Just what this was, or how it operated, does not clearly appear, and we can not determine to whom the taxpayer could rightfully look for responsibility for proper delivery. We are told that it could not look to the United States, while, at the same time, it is said that the United States sequestered the coal. However, it was never supposed that the coal was lost. Apparently, the administration of the pool involved some temporary confusion until deliveries and liability could be traced. This was done and the amount was paid almost entirely in little more than a year—not a long time under the circumstances.